## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOHN LYNN CLARK,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Civil Action No. 13-200** |
| | ) |
| **CAROLYN W. COLVIN,¹ ACTING** | )    **Magistrate Judge Cynthia Reed Eddy** |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

### I.    Introduction

Plaintiff John Lynn Clark ("Clark") brings this action pursuant to 42 U.S.C. §§ 405(g)

and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social

Security ("Commissioner") denying his applications for disability insurance benefits ("DIB")

and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security

Act ("Act") [42 U.S.C. §§ 401-433, 1381-1383f]. The matter is presently before the Court on

cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil

Procedure 56. ECF Nos. 8 & 10. For the reasons that follow, the Commissioner's motion for

summary judgment *(ECF No. 10)* will be denied, and Clark's motion for summary judgment

*(ECF No. 8)* will be denied to the extent that it requests an award of benefits but granted to the

extent that it seeks a vacation of the Commissioner's decision, and a remand for further

---

¹ Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, succeeding former
Commissioner Michael J. Astrue. Social Security History-Social Security Commissioners,
http://www.ssa.gov/history/commissioners.html (as visited on September 30, 2013). Consequently, Acting
Commissioner Colvin is now the official-capacity defendant in this action. *Hafer v. Melo,* 502 U.S. 21, 25, 112
S.Ct. 358, 116 L.Ed.2d 301 (1991); FED. R. CIV. P. 25(d).

proceedings. The Commissioner's decision will be vacated, and the case will be remanded for further consideration of Clark's applications for DIB and SSI benefits.

## II. Procedural History

Clark protectively applied for DIB and SSI benefits on September 14, 2009, alleging that he had become "disabled" on June 17, 2007. R. at 96, 103, 115. Pennsylvania's Bureau of Disability Determination ("Bureau") denied the applications on January 19, 2010. (R. at 55, 60). Clark responded on February 25, 2010, by filing a timely request for an administrative hearing. (R. at 65-67). On August 1, 2011, a hearing was held in Pittsburgh, Pennsylvania, before Administrative Law Judge ("ALJ") William E. Kenworthy. R. at 30. Clark, who was represented by counsel, appeared and testified at the hearing. R. at 33-44. Tania Shullo ("Shullo"), an impartial vocational expert, also testified at the hearing. R. at 44-46. In a decision dated September 22, 2011, the ALJ determined that Clark was not "disabled" within the meaning of the Act. R. at 11-23.

On October 13, 2011, Clark sought administrative review of the ALJ's decision by filing a request for review with the Appeals Council. R. at 7, 10, 168. The Appeals Council denied the request for review on December 20, 2012, thereby making the ALJ's decision the "final decision" of the Commissioner in this case. R. at 1. Clark commenced this action on February 7, 2013, seeking judicial review of the Commissioner's decision. ECF Nos. 1-3. Clark and the Commissioner filed motions for summary judgment on August 8, 2013, and September 9, 2013, respectively. ECF Nos. 8 & 10. Those motions are the subject of this memorandum opinion.

## III. Standard of Review

This Court's review is plenary with respect to all questions of law. *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999). With respect

to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience,

3

engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process by stating as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

4

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes

omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject

to judicial review under the "substantial evidence" standard. *McCrea v. Commissioner of Social

Security*, 370 F.3d 357, 360-361 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's

decision cannot be affirmed on a ground other than that actually relied upon by the agency in

making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67

S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of
> administrative law. That rule is to the effect that a reviewing court, in dealing
> with a determination or judgment which an administrative agency alone is
> authorized to make, must judge the propriety of such action solely by the grounds
> invoked by the agency. If those grounds are inadequate or improper, the court is
> powerless to affirm the administrative action by substituting what it considers to
> be a more adequate or proper basis. To do so would propel the court into the
> domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has

recognized the applicability of this rule in the Social Security disability context. *Fargnoli v.

Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four

corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

## IV. The ALJ's Decision

In his decision, the ALJ determined that Clark had not engaged in substantial gainful

activity subsequent to his alleged onset date. R. at 16. Clark was found to be suffering from a

seizure disorder, a depressive disorder, alcoholism, and carpal tunnel syndrome. R. at 16-18.

His seizure disorder, depressive disorder and alcoholism were deemed to be "severe" under the

Commissioner's regulations. R. at 16; 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c),

5

416.920(a)(4)(ii), 416.920(c). The ALJ concluded that Clark's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 18-19.

In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ assessed Clark's "residual functional capacity"[2] as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except limited to simple, repetitive tasks that would not require exposure to heights or hazardous operations.

R. at 19. Clark had "past relevant work"[3] experience as a chef. R. at 45. Shullo classified that position as a "skilled"[4] job at the "light"[5] level of exertion. R. at 45. Since Clark was deemed to be capable of performing only "unskilled"[6] work at the "sedentary"[7] level of exertion, it was determined that he could not return to his past relevant work. R. at 22.

---

[2] The term "residual functional capacity" is defined as "that which an individual is still able to do despite the limitations caused by his or her impairments." *Hartranft v. Apfel*, 181 F.3d 358, 359, n. 1 (3d Cir. 1999)(parentheses omitted), citing 20 C.F.R. § 404.1545(a). The same residual functional capacity assessment is used at the fourth and fifth steps of the sequential evaluation process. 20 C.F.R. §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii).

[3] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity." 20 C.F.R. §§ 404.1571-404.1576, 416.971-416.976.

[4] "Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced. Skilled work may require laying out work, estimating quality, determining the suitability and needed quantities of materials, making precise measurements, reading blueprints or other specifications, or making necessary computations or mechanical adjustments to control or regulate the work. Other skilled jobs may require dealing with people, facts, or figures or abstract ideas at a high level of complexity." 20 C.F.R. §§ 404.1568(c), 416.968(c).

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

[6] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, [the Commissioner] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs." 20 C.F.R. §§ 404.1568(a), 416.968(a).

[7] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain

Clark was born on February 28, 1962, making him forty-five years old on his alleged onset date and forty-nine years old on the date of the ALJ's decision. R. at 22, 96, 103. He was classified as a "younger person" under the Commissioner's regulations.[8] 20 C.F.R. §§ 404.1563(c), 416.963(c). He had a high school education and an ability to communicate in English. R. at 34, 119; 20 C.F.R. §§ 404.1564(b)(4)-(5), 416.964(b)(4)-(5). Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Clark could work as an order clerk, a sorter, or a surveillance systems monitor. R. at 22. Shullo's testimony established that those jobs existed in the national economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).[9] R. at 45-46.

## V. The Evidentiary Record

Clark apparently graduated from Peabody High School in 1980. R. at 34, 126, 678. At the age of eighteen, he was briefly incarcerated for "pistol whipping" a drug addict who had burglarized his parents' home. R. at 528. In 1989, Clark was seriously injured in a stabbing incident. R. at 38. The injury left him in a coma for four days. R. at 678. His right kidney, appendix and gallbladder were surgically removed. R. at 38, 678. Clark eventually recovered from his injury and graduated from culinary school. R. at 34, 126. He continues to experience abdominal pain near the stab wound. R. at 38. At the hearing, Clark described the pain as "constant agony." R. at 38.

---

amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).
[8] The regulations recognize that "younger persons" between the ages of forty-five and forty-nine are more limited in their ability to adjust to other work than are persons who have not yet attained the age of forty-five. 20 C.F.R. §§ 404.1563(c), 416.963(c).
[9] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003). This burden is commonly satisfied by means of vocational expert testimony. *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

After completing culinary school in 1991, Clark started to work as a chef. R. at 121, 126. Throughout his career, he cooked for several different establishments, including two Indian restaurants. R. at 34-35. During the period of time immediately preceding his alleged onset date of June 17, 2007, Clark was employed by a Holiday Inn Select located in Pittsburgh, Pennsylvania. R. at 34. While working at the Holiday Inn Select on or around June 18, 2007, Clark "fell to the ground and started to shake." R. at 516. He was taken to the University of Pittsburgh Medical Center's ("UPMC") Presbyterian Emergency Department. R. at 516. It was noted that Clark had a history of "alcohol withdrawal seizures." R. at 519. Although Clark had a long history of alcohol consumption, he had not consumed any alcoholic beverages for "several days" prior to his seizure. R. at 512. Dr. Kenneth J. Smith reported that Clark's seizure had "most likely [been] secondary to alcohol withdrawal." R. at 512. Dr. Smith discharged Clark on June 19, 2007, and recommended that he "follow up with Alcoholics Anonymous." R. at 512. Ativan was prescribed to control Clark's anxiety. R. at 512.

Clark did not return to work. The record indicates that he was "fired from his job in June 2007." R. at 528, 531. The termination decision was apparently precipitated by Clark's seizure.[10] R. at 254. At that time, he was renting a home owned by one of his friends. R. at 528, 531. Clark apparently smashed a window in the basement of the house in August 2007. R. at 528, 531. He was evicted from the house shortly thereafter. R. at 528. After the eviction, Clark stopped eating and stayed under a bridge located in Pittsburgh's Schenley Park. R. at 528, 531.

On September 3, 2007, Clark held a gun to his head and thought about killing himself. R. at 528. Frightened by his suicidal thoughts, he threw the gun into a nearby river. R. at 528. The

---

[10] The inquiry required under the Social Security Act does not account for any "reasonable accommodations" mandated by Title I of the Americans with Disabilities Act of 1990 [42 U.S.C. §§ 12111-12117]. *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 803, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 95 (3d Cir. 2007).

8

next morning, he went to UPMC's Western Psychiatric Institute and Clinic ("WPIC"). R. at 528. Clark was voluntarily admitted to the WPIC pursuant to 50 PA. STAT. § 7201. R. at 531. At the time of his admission, Clark stated that God had given him a second chance at life by saving him from the stabbing, and that he had decided not to throw away that "second opportunity." R. at 528, 531. Dr. Rama Goyal discharged Clark from inpatient treatment on October 4, 2007. R. at 532. Clark "did not display acts of aggression" during his hospitalization. R. at 532.

Clark evidently moved in with a "roommate" after leaving the WPIC. R. at 253. He started to drink alcohol again in January 2008, after experiencing "severe leg pain." R. at 253. On January 4, 2008, Clark entered a treatment program known as the "UPMC Barddock Acute Medical Detoxification Program." R. at 237. An upper endoscopy revealed that he had several antral erosions, mild duodenitis, and distal esophageal ulcers. R. at 238. Dr. Howard M. Dubner observed that the ulcers were "consistent with severe reflux esophagitis." R. at 238. Clark was discharged on January 12, 2008. R. at 229. He was given a prescription for Protonix to control his symptoms. R. at 229. After a two-day stay at the WPIC for detoxification treatment in August 2008, Clark was "discharged with bus tickets to a homeless shelter." R. at 459.

On September 28, 2008, Clark was "found under a bridge in a puddle of water" at Schenley Park. R. at 183. It is not entirely clear how he ended up in that situation. A treatment note authored by Dr. Robert Baraff, a neurologist affiliated with the West Penn Allegheny Health System, states that Clark "was attacked by five assailants, beaten unconscious, robbed and left naked in a pond to die." R. at 669. A separate treatment note prepared by Dr. Laurie A. Kilkenny suggests that Clark had been "running around nude in public" in order to get arrested, since he was "reportedly homeless" and looking for "a place to stay." R. at 170. In any event, Clark received inpatient treatment at UPMC's Mercy Hospital. R. at 180-182. On October 2,

2008, a psychiatrist opined that Clark was suffering from "mild delirium possibly secondary to anoxic brain damage and alcohol-related brain damage." R. at 181. During his hospitalization, Clark "refused to engage in any discussion about his alcohol abuse." R. at 181. He was discharged on October 6, 2008. R. at 180.

Dr. Baraff evaluated Clark on October 20, 2008. R. at 669-671. Clark complained of "intermittent headaches with nausea, vomiting, photophobia and phonophobia." R. at 669. He was instructed not to drive or otherwise place himself "in any situation in which an alteration in [his] level of consciousness [would] endanger himself or others." R. at 671. Dr. Baraff repeated this admonition to Clark ten days later. R. at 666. A computed tomography ("CT") scan of Clark's head yielded "[n]o acute intracranial findings." R. at 663.

In a "medical source statement" dated January 31, 2009, Dr. Baraff reported that Clark could "never" lift objects weighing ten pounds or more. R. at 881. No limitations were identified with respect to Clark's sitting, standing and walking abilities. R. at 881-882. In a handwritten notation, Dr. Baraff declared Clark to be "unable to work" because of an uncontrolled seizure disorder. R. at 882. When Dr. Baraff completed the statement, Clark was at a UPMC facility for detoxification treatment. R. at 249-250. He was discharged on February 11, 2009. R. at 249.

When Clark celebrated his forty-seventh birthday on February 28, 2009, he consumed a significant amount of alcohol. R. at 385. On March 2, 2009, he appeared at the WPIC in a "grossly intoxicated" state. R. at 385. It was determined that he had an "upper respiratory infection, alcoholic hepatitis, and pancreatitis." R. at 385. Clark also complained of "increased depression related to homelessness and [an] inability to work." R. at 381. He remained at the WPIC until March 9, 2009, when he was discharged. R. at 380. Two days later, he was

10

admitted to UPMC's Presbyterian Emergency Department for chest pain. R. at 339. Clark was discharged on March 13, 2009, and instructed not to drive. R. at 339-341. Dr. Andrew M. King observed that Clark could not drive because of his "recent seizure history." R. at 341. On March 20, 2009, Clark was admitted to the Western Pennsylvania Hospital ("West Penn Hospital"). R. at 634. He was discharged three days later and advised to seek outpatient treatment for his alcoholism. R. at 635. As of March 31, 2009, Clark was still drinking one case of beer per week. R. at 549.

Clark was readmitted to West Penn Hospital in April 2009. R. at 633. A magnetic resonance imaging ("MRI") scan of his brain yielded normal results. R. at 662. On April 8, 2009, Dr. Frank Kush advised Clark to "avoid all alcohol consumption whatsoever." R. at 661. One month later, Dr. Kush described Clark as a "fairly non-compliant patient" who had "continually stated that he w[ould] stop smoking and stop drinking." R. at 547.

Clark returned to West Penn Hospital on June 24, 2009, complaining of rectal bleeding. R. at 621. A CT scan of his abdomen and pelvis "showed no acute changes and a stable mildly cirrhotic liver with hepatic steatosis." R. at 621. Two days later, a colonoscopy detected the presence of "internal hemorrhoids which were not bleeding actively." R. at 621. Clark was discharged on June 26, 2009, with instructions to "return to normal activities as tolerated." R. at 622.

On July 20, 2009, Clark experienced an "acute onset of left-sided chest pain" while walking down a street. R. at 619. He had apparently stopped taking his medications because of "insurance issues." R. at 619. Objective testing performed at West Penn Hospital detected no active diseases in his chest. R. at 757. Nonetheless, an ultrasound revealed that Clark was suffering from cirrhosis of the liver. R. at 754, 601, 610, 612.

11

Dr. Kush examined Clark at West Penn Hospital on August 8, 2009. R. at 795. Clark complained of abdominal pain, vomiting, diarrhea, and increased urination. R. at 795. At that time, he was drinking six packs of beer per day. R. at 795. An ultrasound of his upper right quadrant yielded normal results. R. at 605-606, 808-809. Clark was discharged on August 11, 2009. R. at 793-794. He apparently moved in with a friend after leaving West Penn Hospital. R. at 793.

Clark was examined by Dr. Baraff on October 7, 2009. R. at 656-658, 832-834. Dr. Baraff observed that the pain in Clark's upper right quadrant may have been "related to scar tissue from an old stab wound." R. at 656, 832. It was further noted that Clark was "homeless and liv[ing] deep in the woods associated with the Allegheny Cemetery." R. at 656, 832. Dr. Baraff's examination revealed that Clark was "neurologically stable." R. at 658, 834. Clark's "seizure precautions" were left in place. R. at 658, 834.

On October 12, 2009, Clark was evaluated by Lisa McGrath ("McGrath"), a certified physician assistant. R. at 545. During the examination, Clark stated that he needed to secure SSI benefits in order to "get a roof over his head." R. at 545. McGrath noticed that Clark's hands were stained with nicotine. R. at 545. She further reported that he "d[id] not have much access to food and meals." R. at 545.

Clark had a seizure during the evening of October 19, 2009. R. at 653, 829. The seizure apparently occurred because he had forgotten to take his prescribed dose of Dilantin. R. at 653, 829. Dr. Baraff examined Clark and found him to be "in minimal distress from his neck and lumbar pain." R. at 653, 829. Clark stated that while he wanted to find a shelter that was safe, he did not want to go to an "insane asylum." R. at 653, 829. Dr. Baraff discharged Clark and instructed him not to drive. R. at 655, 831.

12

On December 12, 2009, Clark slipped and fell while walking on ice. R. at 701, 825. He sustained an abrasion to his scalp. R. at 701, 825. A college student found Clark "dazed" and "in a pool of blood." R. at 701, 825. Although Clark refused to seek emergency treatment at the scene, he went to Dr. Kush's office two days later. R. at 701, 825. A CT scan of Clark's brain detected "[n]o evidence of an acute intracranial event." R. at 828. A subsequent examination performed by Dr. Baraff revealed that Clark was neurologically stable. R. at 827.

On December 21, 2009, Dr. Linda S. Rockey performed a consultative psychological evaluation of Clark in connection with his applications for DIB and SSI benefits. R. at 689-698. After completing the evaluation, Dr. Rockey stated that Clark's "prognosis in terms of obtaining and maintaining gainful full-time employment" was "highly guarded and unlikely" because of his "multiple medical problems." R. at 695. She asserted that Clark "would have difficulty maintaining consistent employment, interacting effectively with others in a work-related setting, comprehending and completing complex work-related tasks owning to reduced concentration, meeting deadlines, and adapting to changes in a work environment." R. at 695-696. On a checklist form, Dr. Rockey indicated that Clark was "moderately" limited in the relevant areas. R. at 697. She also observed that his "difficulties with sustained walking, standing, sitting, lifting, and bending" would adversely affect his ability to work. R. at 695.

Dr. John Vigna, a non-examining medical consultant, opined on December 30, 2009, that Clark was "able to meet the basic mental demands of competitive work on a sustained basis." R. at 706. In the narrative portion of his consultative report, Dr. Vigna explained:

> The claimant can perform simple, routine, repetitive work in a stable environment. He has a history of impulsive behavior. He is able to carry out very short and simple instructions. He would be able to maintain regular attendance and be punctual. Moreover, he could be expected to complete a normal workday without exacerbation of psychological symptoms. He is capable of asking simple questions and accepting instruction. Additionally, he can sustain an ordinary

13

routine without special supervision. He retains the ability to perform repetitive work activities without constant supervision.

R. at 706. In making these observations, Dr. Vigna purported to give "great weight" to Dr. Rockey's examination findings. R. at 706. Clark's subjective complaints were deemed to be only "partially credible." R. at 706.

Clark's medical records were reviewed by Dr. Paul Reardon. R. at 726-731. On January 14, 2010, Dr. Reardon reported that Clark was physically capable of performing a range of "light" work that did not involve exposure to workplace hazards or the climbing of ladders, ropes or scaffolds. R. at 722-725. The Bureau denied Clark's applications for benefits shortly after receiving Dr. Reardon's report. R. at 55, 60.

Dr. Kush examined Clark on January 26, 2010. R. at 836. On that occasion, Clark stated that he was "taking his medications regularly" and experiencing "no new seizures." R. at 836. Dr. Kush found Clark's "[m]ultiple chronic medical problems" to be "under reasonable control." R. at 836. Clark was instructed to continue with his preventative health care on a regular basis. R. at 836.

Clark suffered a seizure on February 12, 2010. R. at 821. The seizure occurred while Clark was walking to a store to buy bread and milk. R. at 821. He returned home without seeking emergency medical care. R. at 821. On February 26, 2010, Dr. Baraff determined that Clark was "neurologically stable." R. at 823. Objective testing yielded normal results. R. at 824. Clark was instructed not to drive. R. at 823.

On May 11, 2010, Clark noticed that he had "bright red blood" in his stool. R. at 837. He went to West Penn Hospital one day later. Dr. Ronald J. Nigborowicz detected "no palpable abnormalities" in Clark's abdomen and rectum. R. at 837. Dr. Nigborowicz suspected that

14

Clark had experienced only "hemorrhoidal bleeding episodes." R. at 837. Medication was prescribed to alleviate Clark's symptoms. R. at 837.

Clark was "found intoxicated at a bar" on November 18, 2010. R. at 781. After he fell from a stool, paramedics at the scene transported him to West Penn Hospital. R. at 781. Upon his arrival at West Penn Hospital, Clark stated that he had consumed a "six-pack" because it was the one-year anniversary of his mother's death. R. at 779-781. A CT scan of Clark's brain uncovered "[n]o acute intracranial abnormalities." R. at 792. He was discharged the next day. R. at 779. Dr. Laura Hughes noted that, at the time of his discharge, Clark "did not represent an immediate threat to either himself or others." R. at 780.

Clark apparently suffered another seizure in March 2011. R. at 817. He was found by police officers, who ultimately decided to transport him to Shadyside Hospital. R. at 817. Although Clark was quickly discharged, he returned to Shadyside Hospital two days later. R. at 817. Upon his return, Clark complained of a migraine headache accompanied by "aches and pains all over his body." R. at 817. On March 28, 2011, Dr. Baraff admonished Clark to refrain from activities in which an altered level of consciousness would result in imminent danger. R. at 819. Dr. Baraff reiterated that warning on May 18, 2011. R. at 815.

On May 26, 2011, Dr. Arnold S. Broudy determined that Clark had carpal tunnel syndrome in his right arm. R. at 885. It was determined that Clark was "a candidate for decompression of the right median nerve." R. at 885. He was provided with a sling. R. at 885. The recommended surgical procedure was performed by Dr. Broudy on June 28, 2011. R. at 888. Clark's sutures were removed on July 14, 2011. R. at 884. At that time, Dr. Broudy observed that Clark's wound was "nicely healed." R. at 884. On August 18, 2011, Dr. Broudy cleared Clark to resume his "normal activities." R. at 883.

15

## VI. Discussion

In response to a hypothetical question describing an individual with the abilities and limitations reflected in the ALJ's residual functional capacity assessment, Shullo testified that the hypothetical individual could work as an order clerk, a sorter, or a surveillance systems monitor. R. at 45-46. Clark testified that he was right-handed. R. at 43. Shullo stated that a restriction permitting only occasional fingering with one's dominant hand would eliminate the order clerk and sorter positions, but not the surveillance systems monitor positions. R. at 46. She further asserted that a "sedentary" employee who was limited to occasional fingering with his or her dominant hand could not perform the duties of any job other than that of a surveillance systems monitor. R. at 46. Under the Commissioner's regulations, an impairment must satisfy the Act's twelve-month durational requirement in order to be "severe." 20 C.F.R. §§ 404.1522, 416.922. Since Clark's carpal tunnel syndrome had been "alleviated within less than twelve months by appropriate treatment," the ALJ concluded that it had not affected Clark's ability to work long enough to reduce his residual functional capacity. R. at 18.

Clark testified that his pain typically prevented him from standing for more than fifteen minutes or sitting for more than thirty minutes. R. at 39. He stated that he frequently needed to lie down throughout the course of a day. R. at 39. The ALJ partially credited Clark's subjective complaints by restricting him to "sedentary" work. R. at 19. The dangers inherent in Clark's seizure disorder were accommodated by the limitations precluding "exposure to heights or hazardous operations." R. at 19. The ALJ's hypothetical question also included restrictions precluding exposure to temperature extremes, dust, fumes, or other respiratory irritants. R. at 45. While those limitations were not included in the subsequent assessment of Clark's residual functional capacity, Shullo's testimony nevertheless established that they would not preclude an

individual from working as an order clerk, a sorter, or a surveillance systems monitor. R. at 45-46. At this stage, Clark does not challenge the ALJ's evaluation of his physical limitations. ECF No. 9 at 5-13. Consequently, the Court will assume *arguendo* that all of Clark's physical limitations were adequately addressed by the ALJ's residual functional capacity assessment.

The crux of Clark's argument is that the ALJ erred in failing to account for the mental limitations found by Dr. Rockey and Dr. Vigna. ECF No. 9 at 5-13; ECF No. 12 at 2-5. Dr. Rockey found Clark to be "moderately" limited in his abilities to understand, remember and carry out detailed instructions, respond appropriately to work pressures in a usual work setting, respond appropriately to changes in a routine work setting, and interact appropriately with supervisors, co-workers, and members of the general public. R. at 697. Dr. Vigna's consultative report contained similar findings. R. at 704-705. By limiting Clark to a range of work requiring the performance of only "simple, repetitive tasks," the ALJ adequately accounted for any restrictions in Clark's abilities to understand, remember and carry out detailed instructions. R. at 19. The ALJ's treatment of Clark's remaining limitations, however, cannot be ascertained from the record.

Dr. Vigna stated that Clark could "perform simple, routine, repetitive work in a *stable* environment." R. at 706 (emphasis added). Although the ALJ purported to accord Dr. Vigna's opinion "[s]ubstantial weight," he did not restrict Clark to a "stable" work environment involving relatively few workplace changes. R. at 19, 21. Dr. Rockey indicated that Clark was "moderately" limited in his ability to respond appropriately to changes in a routine work setting. R. at 697. Unfortunately, Dr. Rockey's handwritten notations are illegible and difficult to understand. Nevertheless, a notation appearing on the checklist form completed by Dr. Rockey suggests that the limitation in Clark's ability to adapt to workplace changes was *more* than

17

"moderate" (though less than "marked"). R. at 697. The ALJ did not discuss this limitation in his decision. R. at 21. Furthermore, the ALJ did not address Clark's remaining deficiencies by restricting his contact with others or limiting him to low-stress work environments. R. at 19-21.

When conflicting medical opinions are expressed, an administrative law judge is ordinarily "free to choose the medical opinion of one doctor over that of another." *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 505 (3d Cir. 2009). In the absence of countervailing evidence, however, assessments supplied by competent medical professionals cannot be disregarded solely on the basis of an administrative law judge's "own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). The ALJ appears to have rejected some of Clark's alleged mental limitations because he had "not mention[ed] any mental health symptoms as disabling conditions" when asked why he could not work. R. at 20. In any event, Clark testified that he had been experiencing "[q]uite a bit" of depression, that he had forgotten what it was like to be happy, and that he had no motivation or energy. R. at 44. While the extent of Clark's mental limitations may have been uncertain, the ALJ's reference to "tasks of a simple and repetitive nature"[11] was simply too vague to fully capture those limitations. R. at 45; *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004). The record confirms that Clark was repeatedly hospitalized between his alleged onset date and the date of the ALJ's decision. Even if Clark's impairments were not severe enough to prevent him from working on certain days, his frequent need for inpatient treatment during the relevant period of time is a factor that should have been considered. *Kangas*, 823 F.2d at 777-778.

Since the ALJ failed to adequately account for the limitations resulting from Clark's mental impairments, the Commissioner's decision cannot be affirmed. *Reefer v. Barnhart*, 326 F.3d 376, 381-382 (3d Cir. 2003)(recognizing that an affirmance is improper when disputes

[11] The ALJ used the quoted phrase in his hypothetical question to Shullo. R. at 45.

18

between competing pieces of evidence remain unresolved). The statutory provision authorizing the commencement of this action provides a reviewing court with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). An immediate award of benefits is justified only where "the evidentiary record has been fully developed," and where "the evidence as a whole clearly points in favor of a finding that the claimant is statutorily disabled." *Ambrosini v. Astrue*, 727 F.Supp.2d 414, 432 (W.D.Pa. 2010). That standard is not satisfied in this case. Although Clark argues that his mental impairments resulted in functional limitations extending beyond those acknowledged by the ALJ, his counsel never asked Shullo whether those alleged limitations would preclude the performance of substantial gainful activity. R. at 46. Because the record does not establish that the additional limitations found by Dr. Rockey and Dr. Vigna would prevent Clark from maintaining a full-time job, the proper remedy in this case is a remand for further proceedings rather than a judicially-ordered award of benefits.

Section 105 of the Contract With America Advancement Act of 1996 ("CWAAA") amended the Social Security Act to provide that "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." Pub. L. No. 104-121, § 105; 110 Stat. 847, 852-853 (1996); 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J). The Commissioner has promulgated regulations to implement this statutory mandate. Under the applicable regulations, the critical question is whether a claimant who is disabled as a result of drug or alcohol abuse would remain disabled if he or she were to stop using those substances. 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). If his or her disability would persist even after a cessation of

19

drug or alcohol abuse, he or she is entitled to benefits. 20 C.F.R. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii). If a claimant's disability would cease in the absence of continued drug or alcohol consumption, a finding of "materiality" is warranted, thereby requiring a denial of benefits. 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i). When the independent effects of a claimant's impairments cannot be separated from the effects of his or her continued substance abuse, an award of benefits is proper. *Salazar v. Barnhart*, 468 F.3d 615, 622-626 (10th Cir. 2006). Since Clark was repeatedly hospitalized for detoxification treatment, the CWAAA could potentially preclude an award of benefits in this case even if his functional limitations were otherwise disabling during the relevant period of time. The impact of a claimant's substance abuse does not become relevant unless or until it is determined that he or she is otherwise "disabled." *Brueggemann v. Barnhart*, 348 F.3d 689, 694-695 (8th Cir. 2003). In this case, the ALJ declared that if Clark "were somehow to be considered as disabled, his alcoholism would be a major factor materially contributing to his disability." R. at 21. Although this conditional statement does not constitute an alternative finding justifying an affirmance of the ALJ's decision, the unanswered questions relating to Clark's continued abuse of alcohol strongly counsel against an award of benefits and in favor of a remand. *Ambrosini*, 727 F.Supp.2d at 432.

In determining that jobs consistent with Clark's abilities and limitations existed in the national economy, the ALJ used Medical-Vocational Rule 201.28 as a framework for decisionmaking. R. at 22. Given that Clark was forty-five years old on his alleged onset date, it appears that the ALJ should have used Rule 201.21 rather than Rule 201.28. 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 1. That mistake was inconsequential, since both rules would support a determination that Clark was not disabled. *Id.*

Under the Commissioner's regulations, the rules pertaining to "age categories" are not applied "mechanically" when a claimant is "within a few days to a few months of reaching an older age category." 20 C.F.R. §§ 404.1563(b), 416.963(b). The regulations ensure that the general rules will not be employed to "produce arbitrary results in individual cases." *Kane v. Heckler*, 776 F.2d 1130, 1134 (3d Cir. 1985). The ALJ's decision was issued roughly five months before Clark's fiftieth birthday. R. at 11-23, 96, 103. Clark maintains that his predicament should have been treated as a "borderline situation" for purposes of his age category, in which case he might have been awarded benefits under Rule 201.14. ECF No. 9 at 14-16; ECF No. 12 at 6-7. Although this argument may have some force with respect to Clark's SSI claim, it does not help his DIB claim. The record indicates that he was insured for benefits under Title II only through December 31, 2010. R. at 14, 16, 157. On that date, Clark's fiftieth birthday was more than a year away. Since the intervening period of time was not measured by "days" or "months," it was clearly not a "borderline situation." 20 C.F.R. §§ 404.1563(b), 416.963(b). If Clark believes that his argument concerning the age categories and the Medical-Vocational Rules would support a favorable disposition of his SSI claim, he remains free to press that issue on remand.

## VII. Conclusion

For the foregoing reasons, the Commissioner's motion for summary judgment (*ECF No. 10*) will be denied, and Clark's motion for summary judgment (*ECF No. 8*) will be denied to the extent that it requests an award of benefits but granted to the extent that it seeks a vacation of the Commissioner's decision, and a remand for further proceedings. The Commissioner's decision will be vacated, and the case will be remanded for further consideration of Clark's applications for DIB and SSI benefits. The Commissioner must "reopen and fully develop the record before

21

rendering a ruling" on Clark's claims. *Thomas v. Commissioner of Social Security Administration*, 625 F.3d 798, 800 (3d Cir. 2010). No opinion is expressed as to whether Clark was statutorily "disabled" during the period of time relevant to this case.

Cynthia Reed Eddy
United States Magistrate Judge

cc:    All counsel of record